1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

11   ALLEN HAMMLER,                    Case No.: 17-CV-1185-AJB(WVG)
12                          Plaintiff,
                                       **REPORT AND**
13   v.                                **RECOMMENDATION ON**
                                       **DEFENDANT'S MOTION FOR**
14   F. AVILES,                        **SUMMARY JUDGMENT**
15                          Defendant.
                                       **[Doc. No. 60.]**
16
17
18

19        Plaintiff Allen Hammler, a state prisoner, has sued correctional officer Defendant
20   Aviles under 42 U.S.C. § 1983. Hammler alleges Aviles used excessive force against him
21   by performing a takedown maneuver in 2016. Hammler further alleges that after he made
22   a recorded statement accusing Aviles of excessive force in connection with the incident,
23   Aviles retaliated against him by filing a disciplinary report based on the same incident.
24   Defendant Aviles has moved for summary judgment on both claims. The Court
25   RECOMMENDS that Defendant's summary judgment motion be GRANTED, and that
26   judgment be entered in his favor.
27   / / /
28   / / /

# I. BACKGROUND & UNDISPUTED FACTS[1]

## A. Defendant Performed a Takedown of Hammler During an Escort in November 2016.

Allen Hammler, an adjudicated vexatious litigant,[2] is an inmate at Richard J. Donovan Correctional Facility in San Diego, California. On November 7, 2016, correctional officer Aviles escorted Hammler from a law library holding cell back to Hammler's assigned cell. (First Amended Complaint, Doc. No. 37 at 3.) Hammler asked Aviles for permission to retrieve paperwork from an inmate in another holding cell, and Aviles agreed to allow him to do so. (*Id.*) In reality, however, Hammler was attempting to retrieve food from this inmate. (*Id.*) When Aviles discovered that Hammler had lied about what he was trying to retrieve, he told Hammler to keep walking. (*Id.*) Hammler then asked Aviles to let him stop at a different cell to retrieve a document from a different inmate. (*Id.* at 4.) Aviles again agreed to allow this. (*Id.*) Once Hammler retrieved the document, Aviles resumed escorting him back to his cell. (*Id.*) Up to this point, Aviles's demeanor was normal and the escort was uneventful. (*See* Decl. J. Fisher Ex. 1 (Hammler Tr.) at 34:6-37:6.)

"[A]ll of the sudden," Aviles began to "manhandle" Hammler by "yanking his arm and Henching [sic] him up to the point his shoulder was being raised and he was being Drug [sic] rather than being led/escorted." (Doc. No. 37 at 4.) Hammler alleges that he verbally complained about the treatment, but Aviles responded only with: "Then hurry up." (*Id.*) At that point, Hammler stopped walking and refused to continue. (*Id.* at 4-5.) Aviles

---

[1] In describing the facts herein, the Court credits Hammler's deposition testimony and the three inmates' declarations he submitted in opposition to the MSJ. The Court states the facts in the light most favorable to him, as the non-moving party. The Court expresses no opinion as to whether these facts could or would be proven at trial.

[2] (*See* Doc. No. 36 (declaring Plaintiff a vexatious litigant).)

ordered Hammler to continue walking, but Hammler refused again, telling Aviles that he would not continue until Aviles called another officer to assist with his escort. (*Id.* at 5.)

Aviles then said that he did not need another officer to assist him, to which Hammler responded: "I'm not moving until another Officer comes over here. It's because of Rookies like you trying to be tough that I have all those Tags on my door now and I'm suing them." (*Id.*) Aviles responded: "You gonna do this now, you really want to do this right now?" to which Hammler replied: "Yup." (*Id.*)

At that point, Aviles performed a takedown maneuver that brought Hammler to the ground. (*Id.* at 5-6.) Once on the ground, Aviles held Hammler down by placing his weight on Hammler, with his knee on Hammler's lower back. (*Id.* at 6.) Other officers responded to the incident and applied leg restraints. (Hammler Tr. at 47:9-48:3; Decl. F. Aviles ¶ 7.) One of the officers then escorted Hammler to a holding cell. (Decl. F. Aviles ¶ 7.)

Three other prisoners apparently witnessed the above events to varying degrees, and Hammler submitted their declarations in support of his opposition to the MSJ. Inmate Rico Riley only witnessed Aviles escort Hammler to cell 104, where Hammler and the inmate in that cell exchanged "documents of some kind." (Decl. Riley, Doc. No. 70 at 8.) Missing from Riley's declaration is any mention of Hammler and Aviles's interactions or Aviles taking Hammler to the ground or otherwise using any force on him. (*See id.*)

Inmate Charles Cleveland declares he saw Aviles escorting Hammler by the arm while it appeared they were arguing. (Decl. Cleveland, Doc. No. 70 at 9.) Cleveland saw the two stop walking and saw them standing in the middle of the floor while arguing. (*Id.*) They "exchanged words" for "about a minute" when Cleveland saw Aviles take Hammler to the ground by positioning himself behind Hammler and "wrapping his arms around [Hammler] to bear-hug [sic] him." (*Id.*) Cleveland saw Aviles pick "Hammler up and slam[] him to the ground." (*Id.*) Although Cleveland states he was "surprised by this because Hammler was not doing anything but standing there," Cleveland's declaration does not include anything about what Hammler said to Aviles. (*See id.*)

Inmate Dennis Armstrong declares essentially the same as inmate Cleveland but with minor additional details. He describes seeing Aviles and Hammler walking and arguing, standing and arguing for a minute, Aviles placing Hammler in a "bear hug," and Aviles "slamming" Hammler on the ground. (Decl. Armstrong, Doc. No. 70 at 10.) In similar fashion as Cleveland, Armstrong also expresses surprise at seeing this because he did not see Hammler doing "anything to" elicit this action. (*Id.*) Like Cleveland, Armstrong also does not include any details about the content of Hammler and Aviles's argument. (*See id.*) Armstrong adds that he did not see Hammler attempting to "kick [Aviles] or anything." (*Id.*)

**B.      Doctors Examined Hammler and Found No Significant Injury.**

Following the November 7 incident, Hammler visited prison medical staff on several occasions. Immediately after the incident, consistent with CDCR protocol, a registered nurse medically evaluated Hammler. (Decl. J. Guirbino Ex. 1 at 15.) The nurse noted a bump on the left side of Hammler's head, as well as some bruising and abrasions on his left shoulder and right triceps area. (*Id.*) At that time, Hammler declined further treatment, opting instead to make a video-recorded statement alleging excessive force. (Hammler Tr. at 89:2-11.)

Hammler elected to return to the medical office that afternoon. (*See* Decl. C. Domingo Ex. 1.) He was first seen by the nurse who had evaluated him after the incident and then by Dr. Barenchi. (*See id.*; Decl. R. Barenchi ¶¶ 3-8.)  Hammler complained of mild ringing in his ears and a moderate headache. (Decl. R. Barenchi ¶ 4 & Ex. 1.) He did not complain of any pain to his arm or shoulder. (*Id.* ¶ 8 & Ex. 1.) Hammler reported no loss of consciousness, no nausea or vomiting, no changes in vision, and no weakness or numbness. (*Id.*) Dr. Barenchi also noted that Hammler did not appear to be in acute distress and was laughing and smiling during the visit, which suggested to him that his injuries were not significant. (*Id.* ¶¶ 5-6.) Hammler was offered pain medication for his headache, but he declined. (*Id.*)

17-CV-1185-AJB(WVG)

The next day, November 8, Hammler submitted a Health Care Services Request Form (HCS Form) asking to see a doctor, insisting that he believed the November 7 takedown had fractured his shoulder. (Decl. C. Domingo Ex. 3.) He submitted another HCS Form the next day making the same assertion. (*Id.* Ex. 4.) On November 10, Hammler visited Dr. Clayton, who examined him in connection with his alleged shoulder injury. (Decl. D. Clayton ¶¶ 3-4 & Ex. 1.) Dr. Clayton reported that Hammler's left shoulder showed normal range of motion, that his arm strength seemed normal, and that there were no bony abnormalities. (*Id.* ¶ 5.) Hammler again declined pain medication. (*Id.* ¶ 4.) Dr. Clayton concluded there was no evidence that Hammler suffered any serious injury, but nevertheless ordered x-rays at Hammler's request. (*Id.* ¶ 6.) The x-rays showed no acute injury to Hammler's shoulder, and Dr. Clayton went over those findings with Hammler at a follow-up visit the next month. (*See id.* ¶¶ 8-9 & Exs. 2-3.)

## C.   Hammler Received a Rules Violation for Willfully Resisting a Peace Officer.

On November 10—three days after the incident—Aviles issued Hammler a Rules Violation Report (RVR) for willfully resisting a peace officer. (Decl. F. Aviles ¶¶ 9-11 & Ex. 2.) The RVR charged Hammler with violating Title 15 of the California Code of Regulations, section 3005(d)(1), based on Hammler's resisting the November 7 escort. (*Id.*)

After receiving the RVR, but before it was adjudicated, Hammler submitted a grievance on CDCR Form 602. (Decl. J. Guirbino Ex. 1 at 17-18.) In it, Hammler insisted the November 7 takedown was "unnecessary and excessive force" and that the RVR was "slander, libel[], defam[ation]." (*Id.*)

On December 13, after a period of due process during which Hammler had the assistance of an investigative employee to help him collect evidence and question witnesses, an RVR hearing occurred. (Decl. J. Guirbino Ex. 2 at 5-6, 8.) Hammler was present, in good health, and was allowed to respond to the charges. (*Id.* at 8-10.) After the hearing, a Senior Hearing Officer found Hammler guilty and sanctioned him with the loss of 90 days of good-time credits. (*Id.* at 11-13.)

The RVR and the associated penalty were approved by a Chief Disciplinary Officer (*id.* at 14-15) and have never been overturned (Hammler Tr. at 61:5-9).

**D.   Procedural History**

Hammler filed this suit on June 12, 2017, raising three claims, two of which remain. (Doc. Nos. 1, 37.) First, Hammler asserts that Aviles used excessive force in violation of the Eighth Amendment when he performed the November 7, 2016, takedown. (Doc No. 37 at 3.) Second, Hammler alleges that the RVR Aviles issued was in retaliation for Hammler accusing Aviles of excessive force. (*Id.* at 7.) Hammler's original complaint raised a third claim, alleging a federal due-process violation (Doc. No. 1 at 9), but the Court dismissed that cause of action for failure to state a claim (Doc. No. 13 at 2).

After granting Defendant's motion to dismiss the third claim, the Court granted Hammler leave to cure certain deficiencies in the third claim. (Doc. No. 13.) After significant delay, however, the Court issued an Order accepting the amended complaint with only the excessive-force and retaliation claims. (Doc. No. 36.) In that same Order, the Court also declared Hammler a vexatious litigant.

On July 21, 2021, Defendant filed the pending summary judgment motion. (Doc. No. 60.) On October 29, 2021, Hammler filed his opposition after being granted an extension of time to do so. On November 9, 2021, Aviles filed a reply brief.

## II.   STANDARD OF REVIEW

A party may move for summary judgment as to a claim or defense. Fed. R. Civ. Proc. 56(a). Summary judgment is appropriate where the Court is satisfied there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence

of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden by identifying the "portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that show an absence of dispute regarding a material fact. *Id.* (internal quotations omitted).

Once the moving party satisfies this initial burden, the nonmoving party must "designate specific facts showing that there is a genuine dispute for trial." *Id.* at 324 (internal quotation marks omitted). This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the nonmoving party. *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (quoting *Celotex*, 477 U.S. at 324). The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleading[s]." *Anderson*, 477 U.S. at 256.

Summary judgement is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson*, 477 U.S. at 247-48. Notably, the mere presence of a factual dispute does not defeat summary judgment; rather, the disputed fact must be material, and the dispute must be genuine. *Anderson*, 477 U.S. at 248. A fact is material when it might affect the outcome of the suit, and the dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving

party. *Motus v. Pfizer, Inc.*, 196 F. Supp. 2d 984 (C.D. Cal. 2001) (citing *Anderson*, 477 U.S. at 248.)

A defendant's burden on a summary-judgment motion is to point to parts of the record that demonstrate an apparent absence of a genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 323. If the defendant meets that burden, the burden shifts to the plaintiff to establish that a genuine issue of a material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish a relevant factual dispute, the plaintiff may not rely on its pleadings, but must tender evidence of specific facts in the form of declarations, deposition transcripts, or other admissible evidence. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. If the plaintiff fails in its burden, the court should enter summary judgment for the defendant.

Courts should "construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly." *Wilk v. Neven*, 956 F.3d 1143, 1147 (9th Cir. 2020) (quoting *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)).

### III. DISCUSSION

**A.   No Genuine Dispute of Material Fact Exists as to Hammler's Excessive Force Claim.**

In light of the undisputed facts, the takedown maneuver that Defendant Aviles used on Hammler was objectively reasonable under the circumstances and cannot support a claim of excessive force.

The core inquiry when evaluating an excessive force claim is "whether the force was applied in a good-faith effort to maintain order or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986). In this evaluation, courts weigh five factors: (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted, (4) the threat reasonably perceived by the

officer; and (5) the efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 6-7; *see also Whitley*, 475 U.S. at 321.

Here, all of these factors objectively weigh against finding that the takedown in this case violated the Eighth Amendment. First, using force generally was necessary. Hammler admits he stopped walking during a prison escort and refused to comply with Aviles's orders to continue walking to his cell. (*See* Decl. S. DeFoe ¶¶ 6-9; Doc. No. 37, ¶¶ 8-10; Hammler Tr. at 65:8-20.) Moreover, Hammler implicitly threatened Aviles: Hammler referred to the placards on his door, which Aviles understood as referring to notices relating to his various escort restrictions, implying that Hammler had been in altercations with staff or otherwise been disciplined for being unruly in the past. (Decl. F. Aviles ¶ 4; *see also* Hammler Tr. at 44:5-18.) Indeed, even Hammler acknowledges that Aviles's use of force was in response to his failure to comply with Aviles's commands. (Hammler Tr. at 43:25-44:4; 45:11-20; 65:8-13.) In light of Hammler's comments and refusal to comply with orders to continue walking, some amount of force was necessary to maintain order and gain Hammler's compliance and restore order. *See Munoz v. Cal. Dep't of Corr.*, No. CV95-0346-ABC(RC), 1996 U.S. Dist. LEXIS 17759, at *14-15 (C.D. Cal. Oct. 10, 1996) ("Correctional officers may be required to use some measure of force if an inmate refuses a valid order."). In the context of a prison, inmate compliance with lawful commands from correctional officers is essential to maintenance of order, which quickly devolves if inmates are permitted to defy and resist orders at will. Moreover, as is apparent from Hammler's declarations, at least three inmates witnessed Hammler's disobedience and resistance to Aviles's lawful command. Had Aviles ignored or failed to gain Hammler's compliance while in full view of other inmates, good order and discipline would have further eroded. Accordingly, Hammler's refusal to comply with a lawful command, coupled with his aggressive language, necessitated the use of force to gain his compliance.

Second, the amount of force used was proportional to the need. Hammler stopped walking in the middle of a prison escort and refused to comply with orders to continue moving. (*See* Decl. S. DeFoe ¶¶ 6-9; ECF No. 37, ¶¶ 8-10; Hammler Tr. at 65:8-20.) Aviles

performed a takedown maneuver, brought him to the ground, subdued him, and gained control of Hammler. (Decl. F. Aviles ¶¶ 3-6.) There is no evidence that Aviles used other, greater force to accomplish this. There is no evidence of punches, kicking, knee strikes, pressure point pain application, use of chemical agents, or the use of a baton or other objects. Aviles simply took Hammler to the ground and held him there, and Hammler's three witnesses' declarations support this. Accordingly, the forced used here was objectively minimal and proportional to the need gain control of Hammler given that Hammler was not, for example, kicking or otherwise attempting to actively fight Aviles. (*See* Decl. S. Defoe ¶¶ 10-19.)

Third, Hammler's injuries were minimal, if not de minimis. Hammler claims he hit his shoulder and head on the ground during the November 7 incident. (*See* Hammler Tr. 80:18-82:8.) The medical evaluation immediately thereafter showed he had a bump on the head and some bruising and abrasions on his shoulder. (J. Guirbino Ex. 1 at 15.) Hammler's injuries were so unremarkable that he initially refused to receive medical treatment. (Hammler Tr. 89:2-11.) And once he sought medical attention, medical staff found no evidence of significant injury. (C. Domingo Decl. Ex. 1 at 3 (noting scratches, abrasions, bruising/discoloration, and swelling), 16 (diagram showing injuries); Decl. R. Barenchi ¶¶ 3-8 (examining physician noting no significant injuries, noting Hammler was laughing and smiling during the examination, and concluding injuries were not serious); Decl. D. Clayton ¶¶ 3-9.) Accordingly, this factor favors Aviles.

The foregoing notwithstanding, the Court acknowledges that the Supreme Court has held that in the excessive force context, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In *Hudson*, the Court held the appellate court's finding that Hudson's

claims were "untenable" due to the minor injuries he sustained was incorrect in light of the Court's finding that "the blows directed at Hudson . . . [were] not *de minimus* for Eighth Amendment purposes." *Id.* at 9-10. Thus, when significant use of force causes minor injuries, a court cannot rely on the minor nature of the injuries as the sole basis to invalidate an excessive force claim—it is merely one of five factors. However, unlike in *Hudson*, the force Aviles used was *not* significant. Thus, *both* the force Aviles used *and* Hammler's injuries were insignificant here.

Fourth, the threat Aviles reasonably perceived was significant. During this specific escort, Hammler had lied to Aviles about retrieving paperwork in an attempt to manipulate Aviles and then refused to comply with Aviles's orders. Hammler also implicitly threatened Aviles: Hammler referred to the placards on his door, which Aviles understood as referring to notices relating to his various escort restrictions, implying that Hammler had been in altercations with staff or otherwise been disciplined for being unruly in the past. (Decl. F. Aviles ¶ 4; *see also* Hammler Tr. at 44:5-18.) In this situation, a reasonable officer would have felt threatened by Hammler's actions and failure to follow a lawful command. (Decl. S. DeFoe ¶¶ 6-9.)

Finally, Aviles made efforts to temper the severity of his use of force. Officers are sometimes required to use force if an inmate refuses a valid order. *Whitley*, 475 U.S. at 320. Here, instead of immediately resorting to force, Aviles tried to talk to Hammler and convince him to follow orders and continue the escort. (Decl. F. Aviles ¶ 2; Hammler Tr. at 65:8-20; Doc. No. 37 ¶¶ 7-9.) Only after Hammler continued to refuse to comply did Aviles perform a takedown maneuver to take Hammler to the ground. Moreover, after the incident, Hammler received medical attention. *See Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (holding that prison staff providing medical treatment after a use of force tempers the severity of the response). This factor also favors Aviles.

Based on the undisputed facts, all five of the relevant factors weigh in favor of finding that Aviles's takedown of Hammler was not excessive force. As such, there is no genuine dispute of material fact as to the merits of the excessive force claim. Hammler

17-CV-1185-AJB(WVG)

cannot show that the officer applied force maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1992). To the contrary, Aviles applied the takedown maneuver in a good-faith effort to maintain order or restore discipline, and it was not done maliciously or sadistically to cause harm. Accordingly, Aviles is entitled to summary judgment on the excessive force claim against him. Moreover, Aviles is *also* entitled to qualified immunity here.

**B.    Aviles is Also Entitled to Qualified Immunity on Hammler's Excessive Force Claim.**

### 1.    Legal Standard

Qualified immunity shields government officials from damages liability from § 1983 claims unless the official's conduct violated "clearly established" law of which any reasonable official would have been aware. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity balances two important interests: "[T]he need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Once the defendant raises the qualified immunity defense, the burden shifts to the plaintiff to show that (1) the alleged misconduct violated a federal statutory or constitutional right; and (ii) the right was "clearly established" when the conduct occurred. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

A court analyzes the first prong—*i.e.*, whether a federal right was violated—under the traditional summary judgment standard. The plaintiff meets his burden if, taking the facts in the light most favorable to plaintiff, a reasonable jury could return a verdict in his favor. *See Brownlee v. Murphy*, 231 F. App'x 642, 644 (9th Cir. 2007); *K.J.P. v. Cty. of San Diego*, No. 15CV2692-H-MDD, 2019 WL 1586739, at *7 (S.D. Cal. Apr. 12, 2019).

The second prong—*i.e.*, whether the right was "clearly established"—involves examining the circumstances that the official faced and the state of the law when the official engaged in the alleged misconduct. For a right to be clearly established, the law must be so clear that, under the particular circumstances of the case, "every 'reasonable official would understand that what he is doing' is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The law must be so clear that the challenged conduct's unconstitutionality is "beyond debate." *al-Kidd*, 563 U.S. at 741.

Here, qualified immunity bars Hammler's excessive-force claim because the claim does not meet either prong of the *Saucier* two-step analysis. First, as explained above, there is no genuine dispute of material fact that Aviles violated Hammler's Eighth Amendment rights. And, under the circumstances, Aviles's takedown did not violate a clearly established right.

### 2. The Law Was Not Clearly Established in November 2016.

As explained above, no genuine dispute of material fact exists whether the force Aviles used was excessive. Aviles is entitled to summary judgment on that basis alone. As a result, Aviles is additionally entitled to qualified immunity because Hammler cannot satisfy the first *Saucier* prong. However, only for the sake of argument, even if there were a genuine factual dispute as to whether the force Aviles used was excessive, qualified immunity would still apply because Aviles's takedown did not violate clearly established law.

A federal right is "clearly established" when, at the time of the conduct in question, the law was "sufficiently clear that every reasonable official would understand" that what he or she was doing was unlawful. *Wesby*, 138 S. Ct. at 589 (citations and quotations omitted). It is not enough that the right is merely suggested by existing precedent; for a right to be clearly established, the law must be settled and the constitutionality of the conduct must be beyond debate. *Id.*; *see Hunter*, 502 U.S. at 228; *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018) (quoting *al-Kidd*, 563 U.S. at 741).

Existing precedent needs to be so clear that it would put any reasonable official on notice that the particular conduct in question, under the same circumstances facing the defendant, would be a constitutional violation. *See Wesby*, 138 S. Ct. at 589-90; *Hamby*, 821 F.3d at 1091.

As of November 2016, the takedown that Aviles performed did not violate a clearly established right. In only two published cases has the Ninth Circuit found that a "tackle" or other takedown has violated the constitution: *Blankenhorn v. City of Orange*, 485 F.3d 463, 478-79 (9th Cir. 2007), and *Santos v. Gates*, 287 F.3d 846, 853-54 (9th Cir. 2002). *See Saetrum v. Vogt*, 673 F. App'x 688 (9th Cir. Dec. 16, 2016). Given this paucity of binding precedent, the appropriate analysis involves comparing the facts of a given case with the facts of *Blankenhorn* and *Santos*. *See Gomez v. City of Vacaville*, 483 F. Supp. 3d 850, 867-68 (E.D. Cal. Sept. 2, 2020) ("To deny qualified immunity, the degree of force used here must be the same as or higher than the degree of force used in *Blankenhorn*, *Santos* or some other controlling authority, and the degree of justification for force must be the same or weaker.") If officers in a given case used force that was greater than or equal to that applied in *Blankenhorn* or *Santos*, and if the officers had the same or less justification for using that force, then they are not immune. *See id.* But if the force used was less than in those cases, or the officers' justification was greater, then the cases would not put the government official on notice that their acts might violate the constitution, and qualified immunity applies. *See id.*

This case is readily distinguishable from both *Blankenhorn* and *Santos*. It differs from *Blankenhorn* because the force used by Aviles was objectively far less severe than was applied in that case. In *Blankenhorn*, a "gang tackle" was used in which three officers pushed Blankenhorn to the pavement in the process of a making an arrest for the alleged crime of misdemeanor trespass. *Blankenhorn*, 485 F.3d at 478. In addition to tackling Blankenhorn to the ground, one or more officers punched him several times and shoved a knee into the back of his neck. *Id.* While some force may be justified to make a misdemeanor trespass arrest, proportionality dictates that the use of force in such a setting

should be minimal. Thus, in the prison setting (as opposed to a misdemeanor trespass), *Blankenhorn* would not have informed an official in Aviles's position that a simple one-man takedown that did not include any other force, and which resulted in little or no injury to the inmate, would be unlawful.

This case is also easily distinguished from *Santos*. In *Santos*, the takedown was so severe it broke the suspect's back. *Santos*, 287 F.3d at 853-54. The Ninth Circuit found that, viewing the evidence in plaintiff's favor, a reasonable jury could find the officer used excessive force primarily because (1) the crime at issue was a minor offense (public intoxication); (2) the suspect did not pose a threat; and (3) the suspect was not actively resisting arrest. *Id.* at 854. The court also noted that the force used was "quite severe," as evidenced by plaintiff's injuries. *Id.* at 853-54. In this case, by contrast, Hammler admitted resisting his escort, admitted to making statements a reasonable officer might interpret as threats, and suffered no serious injuries. (Doc. No. 37 ¶¶ 7-9; Hammler Tr. 65:8-20; Decl. S. Defoe ¶¶ 6-9; Decl. R. Barenchi ¶¶ 3-8; Decl. D. Clayton ¶¶ 3-9; C. Domingo Decl. Exs. 1, 2, 5-7.) The force Aviles used was also far less severe than in *Santos* as evidenced by the minimal injuries to Hammler. Therefore, *Santos* likewise would not have notified a reasonable officer that the takedown in this case would have violated the Eighth Amendment.

Because there is no genuine issue of material fact as to either prong of the qualified immunity analysis, the Court should also find that qualified immunity bars Hammler's excessive force claim.

**B.    No Genuine Issue of Material Fact Exists as to the Retaliation Claim.[3]**

There is also no genuine issue of material fact as to Hammler's retaliation claim. To prevail on a retaliation claim, Hammler must prove five elements: (1) the defendant took

_____

[3] Hammler's opposition does not in any way address Aviles's arguments on the retaliation claim. As a result, the Court may treat this claim abandoned or the issue conceded. *Justice v. Rockwell Collins, Inc.*, 117 F. Supp. 3d 1119, 1134 (D. Or. 2015), aff'd, 720 Fed. Appx.

17-CV-1185-AJB(WVG)

adverse action against the plaintiff (2) because of (3) the plaintiff's engaging in some First Amendment-protected activity, (4) the adverse action would chill or silence a person of ordinary firmness from engaging in future First Amendment activities, and (5) the adverse action did not advance a legitimate penological goal. *See Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012). Aviles does not dispute that issuing an RVR may constitute adverse action or that complaining of excessive force is an act protected by the First Amendment. But Hammler cannot establish any of the other necessary elements of his retaliation claim.

First, Aviles issued the RVR before Hammler submitted his CDCR Form 602 complaining about Aviles's use of force. Moreover, there is no competent evidence that Aviles issued the RVR to Hammler in retaliation for any First Amendment activity. Rather, the only competent evidence is that Aviles issued the RVR because Hammler resisted him during an escort and implicitly threatened him. (Decl. F. Aviles ¶¶ 9-11 & Ex. 2; Decl. S. DeFoe ¶¶ 6-9.) Thus, Hammler cannot prove Aviles issued the RVR "because" Hammler's allegations against Aviles.

Second, Hammler cannot show that receiving an RVR for conduct he admits he engaged in would chill a person of ordinary firmness from exercising his First Amendment

---

365 (9th Cir. 2017) ("[I]f a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.") (citation and internal quotations and brackets omitted); *Bishop v. Harris*, No. EDCV19-1607-PSG(SPx), 2021 U.S. Dist. LEXIS 209733, at *27 (C.D. Cal. June 23, 2021) (same); *see also Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (upholding finding that the non-moving party abandoned claims by not raising them in opposition to a motion for summary judgment); *Marentes v. State Farm Mut. Auto. Ins. Co.*, 224 F. Supp. 3d 891, 919 (N.D. Cal. 2016) ("When a non-moving party opposes summary judgment with respect to some claims, but not others, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.") (internal quotation omitted). Accordingly, Aviles's MSJ on the retaliation claim may be granted on this basis alone.

17-CV-1185-AJB(WVG)

rights in the future. Indeed, receiving the RVR certainly did not chill Hammler from filing this action or from filing over a dozen other actions since he received the RVR.[4]

Finally, the adverse action in this case advanced a clear penological purpose. The RVR accused Hammler of willfully resisting an officer in the performance of his duties, which is precisely what Hammler did. (Decl. F. Aviles ¶ 9 & Ex. 2.) As Hammler admits, he in fact resisted Aviles's escort. (Hammler Tr. at 65:8-20.) And Hammler was found guilty of the rule violation. (Decl. J. Guirbino Ex. 2 at 11.) As a result, the issuance of the RVR advanced the legitimate goal of promoting compliance with prison rules—by the prison population more broadly and by Hammler in particular—by demonstrating that the prison's rules will be enforced. It also furthers penological goals of maintaining the safety and security of institutions, the inmates, and the prison staff. Those are indisputably legitimate penological goals, and the prison's ability to enforce its rules is critical to accomplishing these goals. *See Hunt v. Ramirez*, No. 11CV528-H(PCL), 2013 WL 12049069, at *4 (S.D. Cal. Oct. 18, 2013) (granting summary judgment in retaliation claim based on RVR for violating "regulation that requires inmates to follow direct orders" because it "serves the legitimate penological goal of maintaining the safety and security of the institution, the inmates, and the staff"), aff'd, 592 F. App'x 576 (9th Cir. 2015).

---

[4] *See, e.g.*, *Hammler v. Diaz, et al.*, No. 2021-00301267-CV (Sacramento Cty. Super. Ct. May 25, 2021); *Hammler v. Zydus Pharmacy, et al.*, No. 21CV343 (E.D. Cal. Mar. 4, 2021); *Hammler v. Allison, et al.*, No. 21CV122 (E.D. Cal, Jan. 29, 2021); *Hammler v. Imada, et al.*, No. 21CV149 (S.D. Cal. Jan. 27, 2021); *Hammler v. Bialik, et al.*, No. 21CV2065 (C.D. Cal. Jan. 20, 2021); *Hammler v. Dignity Health, et al.*, No. 20CV1778 (E.D. Cal. Dec. 17, 2020); *Hammler v. Diaz, et al.*, No. 20CV1890 (E.D. Cal. Sept. 21, 2020); *Hammler v. Cal., et al.*, No. 20CV630 (E.D. Cal. May 5, 2020); *Hammler v. Cal., et al.*, No. 20CV884 (E.D. Cal, Apr. 30, 2020); *Hammler v. Diaz, et al.*, No. 20CV488 (E.D. Cal. Apr. 6, 2020); *Hammler v. Burns, et al.*, No. 20CV489 (E.D. Cal. Apr. 6, 2020); *Hammler v. Cal., et al.*, No. 19CV1212 (E.D. Cal. Aug. 30, 2019); *Hammler v. Compose, et al.*, No. 19CV1149 (E.D. Cal. Aug. 23, 2019); *Hammler v. Diaz, et al.*, No. 19CV1141 (E.D. Cal. Aug. 20, 2019); *Hammler v. Cal., et al.*, No. 19CV1057 (E.D. Cal. Aug. 1, 2019).

17-CV-1185-AJB(WVG)

Because Hammler will not be able to establish the required elements of a retaliation claim, Aviles is entitled to summary judgment on this claim.

## IV.   CONCLUSION

The Court RECOMMENDS that Defendant Aviles's MSJ be GRANTED and judgment be entered in his favor.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

IT IS ORDERED that **no later than December 30, 2021**, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties **no later than January 18, 2022**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: November 22, 2021

_____
Hon. William V. Gallo
United States Magistrate Judge

17-CV-1185-AJB(WVG)